Good morning. May it please the Court. My name is Ebony Branch, and I represent the appellants in this matter, Mary Jane Jasin and Thomas Jasin. With the Court's permission, I would like to reserve three minutes for rebuttal. I will obviously watch the time and try to pace my argument accordingly. I'll try to watch your time, but ultimately you're responsible for your time here. Certainly. Thank you, Your Honor. The appellants in this matter petitioned the Court for review and reversal of two court orders issued by the District Court. The first was issued on June 18, 2015, and that order of the District Court dismissed the plaintiff's first amended complaint. In doing so, the District Court found that the seven state law claims were barred by res judicata, so those claims were dismissed with prejudice. The Court also dismissed the two federal securities claims, but did grant the plaintiff's leave to amend those claims. The plaintiffs did amend and did file a second amended complaint on August 14, 2015. The District Court subsequently dismissed that complaint in its entirety in an order that was issued on April 19, 2016. Before getting into the legal arguments for this case, I would like to take a few minutes to really pinpoint and highlight some of the more important and pertinent facts that gave rise to this legal dispute. Mary Jane and Thomas Jasin are husband and wife. At the time that they invested what was in essence their life savings in Vivas, they were 68 years old. They made those investments after relying upon the private and public statements of Vivas' CEO, CFO, and the President in addition to various SEC filings that the company filed. Those public and private statements contained some material misrepresentations regarding most notably and most importantly Vivas' aspects of having their drug Qsimia approved for distribution in Europe. Contrary to the defendant's assertions, the appellants in this case are not merely disgruntled investors who are disappointed that Qsimia was not approved for sale in Europe. They were heavily invested shareholders and as such they deserve the truth about the about the approval or the attempt to get approval for this Qsimia, which is a weight-loss drug. And the company was trying to do that both here in the United States and in Europe. There were sort of parallel approval proceedings going on. I guess I just want to know what's your best argument that you know there was some sort of misrepresentation or fraud on the your clients when there were all these sort of warnings and disclaimers all along the process that you know we don't know what the European you know approval is going to do. It's just because the FDA might be reacting one way you know they kept telling them along the way so I'm just trying to figure out what is your best smoking gun evidence of fraud or misrepresentation by the company to the investors. I think that can answer the answer by breaking down the nature of the misrepresentations into two categories. The first pertains to the way in which the defendants characterize the request for information that can only be derived from cardiovascular studies. The defendants in their various filings use the word may. It is the appellant's contention that they should have used the word or words like they have requested information that could have been derived from cardiovascular studies. And the support for that particular contention comes from the explicit language in the various CHMP reports that were issued by the co-rapporteurs and by the rapporteurs. So for example, turning the court's attention to it will be Exhibit F, the co-rapporteurs explicitly stated, and I quote, there is a negative risk benefit risk, I'm sorry, there is negative benefit risk balance for QCIVA and that cardiovascular events and psychiatric disorders, cognitive impairment and potential metabolic acidosis are of concern and preclude obtaining any market authorization with the available overall data. Now to be clear, it appears from the various reports that Vivas had submitted some form of cardiovascular information from either previous studies or from other studies that they had not personally conducted. However, it was clear that the information that they submitted to the CHMP was insufficient. For example, if you look at the record at page 667, the CHMP in their 180-day list of outstanding issues specifically said, and again I'm quoting somewhat loosely here, that the applicant should further justify the lack of delirious cardiovascular events in both high and low risk populations, as well as the lack of CV safety study before approval. And this was because it appeared to the CHMP that the defendants had submitted studies that did not adequately capture the population they were most interested in. Well, but it seems, I mean, it seems what the argument is, and it seems like a reasonable one, that the statements that the regulators, you know, may require a pre-approval cardiovascular study, which I think is what you're talking about, are true statements because the issue remained an open question, it seems like, until the CHMP rejected Vivas' marketing application. So, I mean, how do you counter that? So, to answer that argument, I would actually point the court to the record at pages 213 and 320. Here, this is the 100-day list of questions, and there the CHMP indicated that, excuse me, Vivas needs to convince the CHMP of the safe use of Conexa in clinical practice, including the performance of a CV safety study. So there, and throughout various reports, the CHMP did indicate in various degrees and respects the appellants would submit to this court that the defendants were on notice that the information they had submitted from the FDA, from their attempts to obtain FDA approval was insufficient when compared or when critically analyzed by the CHMP. Weren't your clients made aware of the fact that this was an issue in Europe, and that if the issue is resolved negatively, it would be bad for the company? I mean, didn't you know those two things? When you say did we know, you mean through SEC filings or through direct conversations with various executive members? All of the communications with Vivas. Well, I think that, I think the fact that Mr. Jazin felt compelled to actually personally call various members, including, I believe it was Defendant Morris, and inquire specifically about the overall regulatory process, shows that he was confused as to the information that was being provided by the company, both through his SEC filings and through the public statements that the various defendants were making. It was not clear to Mr. Jazin, who is a fairly sophisticated shareholder investor, what the status of the regulatory approval process was. So I think that in and of itself lends itself to our argument that the defendants were not unequivocally clear as to exactly what was required of them to obtain the requisite approval for QCV in Europe. But your client wasn't completely in the dark that this was an issue that was unresolved. Isn't that a fair statement? Well, you say there was an issue that was still unresolved, meaning the fact that the CHMP was asking questions about cardiovascular safety? Yes. I think that the problem here isn't that he wasn't made aware that it was an issue. I think the larger problem is that the defendants failed to identify the gravity of the problem. And had they done so, it would have allowed him to make a more informed decision, but your investor client should have been told. What are you proffering? So, court's brief indulgence. In our briefs, we did highlight four cases that we believe speak directly to that point. That being Amlin Farm, CV Therapeutics, Enri Novello, and also Kinetics. In those cases, the courts did hold that when a pharmaceutical company is making statements regarding the prospects of a drug being approved, they have an overview of the most important or the most pertinent parts of those conversations. And here, the most pertinent and important part of the conversations with the EMA was that they had serious reservations, serious questions, serious hesitations about the defendant's ability to convince them that this was a safe drug that could be approved for sale in Europe. And the defendants did not do that. They did not inform shareholders, such as Mr. Jazen, of the grave concerns that the CHMP had regarding this drug. And even more so to that point, the defendants conflated and seemingly confused the two processes. So the second part of, to answer your initial question, your Honor, is the defendants made statements as if the EMA process was directly online and in track with the FDA, and that they made it seem as though the EMA had not requested or had requested information that was not in line with what the FDA had requested. And again, we believe that that's not wholly accurate. And that's why Mr. Jazen felt compelled again to reach out to Mr. Morris and ask him specifically, was there a difference in the information that was being requested by the EMA? But it looks like, I mean, there's various references in the record that Obivius disclosed that the CHMP and the FDA were both worried about potential cardiovascular issues, and I highlight that because that's one of the ones that you mentioned, and warned that CHMP would not necessarily handle this issue in the same way as the FDA. I mean, it seems like if they were warning them and telling them and telling them they're worried about it, I'm trying to figure out why they didn't fulfill that obligation that you identified. But again, I think it comes down to the fact that the defendant spoke in very general terms that failed to convey the severity and the gravity of the EMA's concerns, Your Honor. So again, looking back to the cases that the appellant cited in their brief, again, that being amylin, CB therapeutics, kinetics, we believe that those cases do impose upon the defendant an obligation to provide shareholders in such a situation with additional information regarding the regulatory process when, whether it's the FDA or the EMA, has expressed such grave concerns that really threaten the prospects of the drug being approved for distribution. Is a distinction between disclosure and characterization in the sense that there were disclosures made, but perhaps not with terms that were as drastic as you would like? Well, I wouldn't say that we would have liked. I think that what is warranted or appropriate. So, yes, to answer your question, the short answer is yes. It's one thing to make a disclosure. It's another thing to actually adequately inform. And it's our position that the defendants failed to adequately inform the shareholders, including Mr. Jazdin, particularly about the concerns that the EMA had. Do you want to reserve? Yes, if I may. Yes, thank you. Good morning. I'm Robin Wetchkin on behalf of the defendants and appellees. Can you speak right into the microphone? Yes, I'm sorry, Your Honor. The district court correctly dismissed the claims in this action. Plaintiffs have consistently been unable to identify a single false or misleading statement. Plaintiffs have also failed to plead facts that give rise to a cogent and compelling inference of Cyanter, which is required under TELABS. Plaintiffs focus on one side effect of QSEMIA, and that's the cardiovascular risk. The risk here is that certain patients have a slight elevation of heart rate, a little more than a beat a minute on the high dose, a little less than a beat a minute on the low dose. Vivas disclosed that. Vivas disclosed that in copious detail. Vivas also talked about the implications of that. Vivas talked about how both the FDA and the EMA had been concerned about cardiovascular issues. Vivas talked about the overhang of FENFEN, which was a previous diet drug that had been pulled from the market and put a cloud over the approval of diet drugs thereafter. And Vivas explained why it felt that its drug, QSEMIA, was different. Vivas was convinced that the elevated heart rate for QSEMIA was not a good idea. QSEMIA could be looked at differently because the elevated heart rate was not linked to major adverse cardiovascular events. What matters is whether they're adverse events, not whether the heart rate is raised in isolation. At the same time, the elevated heart rate was counterbalanced by a decrease in blood pressure, which is a good thing from a cardiovascular perspective. Vivas explained all of this, and then critically, Vivas also said, that's our view of the data. There's no guarantee that the FDA is going to see this the same way. There's no guarantee that the EMA is going to see this the same way. There's no guarantee that if one sees it our way, the other will see it our way, too. There's no guarantee that the EMA is going to approve this drug without requiring a preapproval cardiovascular study. All of that was known. I think the court is rightly focused on the risk disclosures that the company made. I think the court is rightly focused also, as was the district court, on the regulatory record that the JASNs have submitted. Can you distinguish, I guess, this Amlin case and some of the other cases that Ms. Branches argued? Sure. There are four district court cases that the appellant cited in their briefs. We have a footnote in which we distinguish all of them, but I'm happy to go through them again. There are different circumstances in all of those cases. In several of them, what's not disclosed are facts about the drug or the clinical trials themselves. For example, in the kinetics case, mice who were given the drug developed cancer. That was never disclosed, nor was the fact that the FDA was concerned about that and that the FDA had never approved a drug in which mouse studies turned out with such results. In other cases, there were definitive statements made by an agency that the company didn't disclose. We don't have anything like that. My adversary focused on statements in isolation in the 80-day report by the co-rapporteur, which was the co-rapporteur's individual report, not the committee speaking as a whole. She also focused on some statements in isolation from the 120-day report, which was the report of the committee as a whole. But as we've explained, and I think as Judge Freeman correctly ruled, you need to look at those reports, not sentence by sentence, but as a whole, and as part of a process. And when you look at the process, it's clear that what plaintiffs have said was the state of affairs, which is that there was a requirement for a pre-approval study, was not the state of affairs at all. You can tell it wasn't the state of affairs because the process didn't end. It didn't end at 120 days, it didn't end at 180 days, it didn't end until the vote at the very end of the process. And significantly, it was a divided vote. The vote was 19 to 10. Vivas didn't know what the vote was going to be before the vote was taken. And for plaintiffs to say that Vivas had an obligation to say that the drug was going to be rejected, is simply to imagine a state of regulatory reality that's not present on the record. I mean, that is the fatal defect of plaintiff's claim, that the statement they wish that Vivas had made is not a statement that would have been accurate. There are portions of the record in the European Regulator's 180-day study concerning these cardiovascular studies that are redacted, and without disclosing any protected details, I just was curious, is there anything in there that the court should be aware of that is relevant to this? That's a very interesting question. I have to explain how those reports came to be in the record. This is the unusual securities case where the excerpts of the record, or what is the RJN in the district court, were not submitted by the defendants, but by the plaintiffs. The 600 pages of regulatory record, the 300 pages of SEC filings, were all submitted by the plaintiffs. Vivas did not put those materials in, and Vivas did not provide the plaintiffs with the documents from the EMA. The plaintiffs received those directly from the EMA, and the EMA made the redactions. I've never seen those documents. I don't know what's in the redactions. Those are redactions that were made by the agency, not by Vivas. In their reply brief, I think plaintiffs recognized, to some extent, that the reality they pose doesn't align with the regulatory record, and they say in their reply, well, Vivas should have disclosed there was a decreased likelihood of approval. That can't save their claims. It can't save their claims factually, because if anything, if you look at the course of the regulatory proceedings, the likelihood seemed to be improving. As Judge Freeman noted, at 180 days, the agency seemed more open to approval without a prior study than at 120 days. As a legal matter, decreased likelihood doesn't cut it either. There's no duty under the securities laws to assign probabilities to events, nor would a duty like that be workable. On the contrary, the cases, including the cases that we've cited, make clear that the courts recognize the fluidity of the regulatory process, the opaqueness in some cases of the regulatory process. It wasn't possible for Vivas to say on one day, well, it's 40 percent, on another day it's 60 percent, on another day it's 80 percent. That's what plaintiffs seem to be suggesting, but that's not a duty that has any toehold in the law. Judge Gould, if I could interject a question, please. Yes, Judge Gould. So could you please tell me your client's position on the significance of the Cienter requirement for this case? Yes, I would be happy to, Judge Gould. In fact, I wanted to get there. I think when we look at Cienter, one of the most important factual issues or factual repositories is the company's communications, not with the EMA, but with the investing public. And when you look at the disclosures in the company's 10-Qs and 10-Ks, you can see copious, copious details. One thing that the company did is every time it had a communication with the CHMP, it dutifully updated the market. We've just gotten another report, we've just gotten another list of questions, we've just met face-to-face, here's what happened. So copious detail about the proceedings as they unfolded, also exhaustive detail about not only cardiovascular risk, but psychiatric risk, teratogenic risk, risks having nothing to do with the approval procedure, risks to intellectual property, risks in changing healthcare law. My point about all of these disclosures is these are not the actions of a company that is trying to defraud its investors, these are not the actions of executives who are trying to hide the risk. This is a company that is doing everything right and informing investors of all of the risks that they face. And I think that is inconsistent with Scienter, and the far more compelling inference to draw is that there was a risk that unfortunately materialized, that was the risk that the CHMP was not happy with the post-approval study the way the FDA was. That's unfortunate, but it's not a risk that was concealed. I think in the reply brief, if I could touch on that for a moment, plaintiffs again drop back a little bit and say, well, maybe not deliberate fraud, maybe just recklessness. That doesn't work either. First of all, as a legal matter, the standard for recklessness in the Ninth Circuit is very high. It's not mere recklessness, it's recklessness approaching conscious misdoing. And factually, we don't have a record that shows recklessness in any event. It shows extraordinary care, extraordinary attention to detail, and I would say exemplary communication with investors about risk. Okay, thank you. I want to talk about the state claims too, but before I do that, and particularly since I'm in a colloquy with Judge Gould, I want to talk about one recent Ninth Circuit case that was decided after the briefs were submitted, and that's Judge Gould's TASA case, decided in August of this year. That's a case where a district court dismissal of securities claims was reversed by this court. And I bring it up because that case is completely different from our case. That's a case where there was a clear, simple, factual misstatement. The company said one component of its medical device had been FDA cleared, which is the equivalent of approved, and it hadn't been. We don't have anything like that here. There was no mystery about the approval process or where the company was in the approval process. The TASA case also involved a regulatory communication that was only partially disclosed. There was a warning letter that identified three different issues with the product, and the company chose to discuss only one of them. The court found that was misleading. Again, we don't have anything like that here. We have very complete disclosures of all of the health issues, all of the other risks. Counsel, what was the point of the dismissal agreement? Was it ever presented to the district court? This is the dismissal of the state law claims. I believe that plaintiffs submitted the agreement to the court. Did the district court ignore it? No, the district court looked at it. The district court talked about it in its discussion of the issue. If I could set the stage a little bit on the state claims, the important fact there is that plaintiffs dismissed their state action with prejudice. Once you do that, under California law, this principle of retracts it comes into play, and a with prejudice dismissal has the same effect as a ruling on the merits. Plaintiffs have never disputed that all three prongs of res judicata under California law are met. Their only out is they say, well, you can contract around res judicata when you do this retracts it, and we contracted around it. They cited to the district court California law and district court law applying California law that said, yes, you can do that, and you can do that by means of express agreement. There's no express agreement here. Plaintiffs don't even contend anymore that there was an express agreement. Instead, they asked this court to look behind the express agreement requirement, which they themselves cited to the district court, look behind Judge Koh's decision in the Perez case, in which she talked about the express agreement requirement from California law, look behind the 1977 case that Judge Koh relied on, which also holds that there is an express reservation requirement, and go all the way back 100 years to a 1999 decision, and then apply that in a way that's different than what the California courts have been doing for the last century. That's not appropriate, especially given the plaintiff's citation of that standard to the trial court. Even if it were, and I'll try to say this in 45 seconds, even if you could contract around res judicata by ordinary contract terms rather than by express reservation, plaintiffs haven't shown that. They have not shown that there was a meeting of the minds that some state court claims would be allowed to be brought into the federal proceeding. There's nothing about reserving claims in the agreement that the plaintiffs have cited. I just want to, before you sit down, apparently, though, both sides did come to an agreement regarding how to proceed. It seems like your clients here agreed that, well, if you decide to come to federal court instead of state court, we'll, you know, if you agree to come to state court, that'll be fine, and we won't push back on the statute of limitations. So there was some discussion and agreement, and I don't know if it was discussed, the state law claims, and exactly how they were discussed, but I guess they agreed, the plaintiffs here agreed, that they would let go of whatever state law claims that they had already presented. Do you know if there was any discussion about all the state law claims there? I will say that the plaintiffs agreed that they would dismiss those claims with prejudice, and the negotiations took place against the background of California law, in which the parties understood what a with prejudice dismissal means, and a with prejudice dismissal means you are foreclosed from bringing any claim that you could have brought. They weren't foreclosed from bringing the federal claims because they couldn't have brought those in state court. There's exclusive federal jurisdiction for those claims. But a with prejudice dismissal means you are foreclosed from bringing anything that you could have brought, and that was the background against which the parties negotiated. If the plaintiffs had wished to preserve state law claims, they could have tried to negotiate about that. They would have said, all right, we'll dismiss these three, but we've got seven more that we'd like to bring. Will you agree to that? I don't know how that would have come out. All we know is what we have, and we can't look at that agreement in isolation. We need to look at it against the background of what experience counsel knew. All right. Thank you very much. Thank you, Your Honor. If I may just address the state law claims. As counsel indicated, the parties did come to an agreement as to what was being dismissed, and the contents of the disagreement, the dismissal agreement, contained the specifically identified enumerated statutes that were being dismissed. And the court has to look at the plain language of that agreement in determining what the party's intent was. It is evident from that agreement that the parties did not place any limitations on any other state law claims. The agreement on its face simply indicated that the seven, that the state law claims that were specifically identified in the agreement will be dismissed in addition to the other provisions. But the request to dismiss the state action did not include the agreement between the parties to only proceed in Federal court, did it? It didn't. The agreement just simply said that. I know. Is there a reason you chose not to incorporate the agreement to dismiss the action into the voluntary request to dismiss that you submitted to State court? I can't provide an answer to that, Your Honor. But I will say that in looking at our interpretation of the case law that cited Miller, we do believe that Miller did not, did not establish a hard set bright line rule that said that in order to survive the application of res judicata, the plaintiff must include express reservation. Miller does not explicitly state that. And the reason we take issue with any indication that it does is because Elena, that decision is the one that misinterpreted Miller's holding. And that, and the Perez court then specifically cited Elena's reasoning. But in doing so, the court misconstrued the holding of Miller. Miller simply said that the plaintiffs in that case were able to survive the application of res judicata because the plaintiffs had included express reservation. But the court, and even a critical review of that decision makes it clear that the court was somewhat irritated by the complexities of that agreement. The court at several junctures indicated that the parties that included contradictory portions in the, in that agreement. And the courts had, the court had to parse through and figure out what the parties really intended. And after doing so, the court simply concluded that based on the circumstance of that case, the parties had included express reservation, which precluded the dismissal of those claims based on res judicata. But the parties here agreed to dismiss with prejudice. I'm sorry, Your Honor? Your party agreed to dismiss with prejudice. In the dismissal agreement, they agreed to dismiss those specific State law claims. There was no mention as to whether or not the parties were precluded from bringing other State law claims, at least within the four corners of that dismissal agreement. But you do understand that if it's dismissed, it's going to be dismissed with prejudice unless you've made some reservation. We understand they will be dismissed. What we are saying and what our position is, is that it is not a requirement that the parties include express reservation. And that's based on our interpretation of Miller and also looking at how the court and consumer advocacy versus Exxon Mobil ruled as well. In that case, the court looked at the express terms of an agreement and said that they were declining to encompass claims that were not specifically identified in the settlement agreement. Thank you. Judge Gould, do you have any further questions? No questions here, thanks.  Thank you both. Ms. Branch, Ms. Wetchkin, is it Wetchkin? Thank you both for your fine presentations today. The matter of Jassen v. Vivas will be submitted. Thank you.
judges: Gould, Murguia, Gritzner